UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 25 CR 778 |
| v. | ) | |
| | ) | Hon. Laura K. McNally |
| SHARON CHRISTINE SACKMAN | ) | |

**GOVERNMENT'S POSITION PAPER**
**AS TO SENTENCING FACTORS**

The United States of America, by Andrew S. Boutros, United States Attorney for the Northern District of Illinois, submits this memorandum to set forth its position with regard to § 3553 sentencing factors and its sentencing recommendation.

## I. Introduction

Defendant Sharon Sackman is a former nurse who sold Ozempic, Botox, and other cosmetic treatments out of a downtown apartment, without a proper license or regulatory approval. Sackman came to the government's attention when three of her customers were hospitalized after having injected themselves with fake Ozempic that she sold to them.

The government charged Sackman with violating the Food, Drug and Cosmetic Act for having dispensed and sold counterfeit Ozempic. She subsequently pleaded guilty to one of the charges. Sackman's sentencing is set for November 4, 2026.

For the reasons set forth below, the government respectfully recommends a sentence which includes a one-month term of custody, joining the recommendation of the Probation Officer.

## II. Sentencing Factors

As a matter of procedure, the sentencing judge must correctly calculate the Sentencing Guideline range, treat the Guidelines as advisory, consider the applicable § 3553(a) factors, select a sentence supported by the facts presented, and then adequately explain the selected sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Annoreno*, 713 F.3d 352, 357 (7th Cir. 2013).

### ***A. Sentencing Guideline Calculations***

The Probation Officer has calculated an offense level total of 4, which, when combined with Sackman's criminal history category of I, results in an advisory Sentencing Guideline range of 0-6 months of imprisonment. *Presentence Investigation Report* ("*PSR*"), at 18 ¶98. Although the Probation Officer's Guideline calculations differ from the government's calculations as set forth in the Plea Agreement and Government's Version of the Offense ("*GVO*"), the government does not object to adopting the Probation Officer's calculations.

### ***B. Other Relevant § 3553 Factors***

By statute, district courts are obligated to consider the following additional sentencing factors, among others:

- the nature and circumstances of the offense (18 U.S.C. § 3553(a)(1));
- the history and characteristics of the defendant (*id.*); and
- the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant

> with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (*id.* § 3553(a)(2)).

The government discusses the pertinent § 3553 factors below.

**1. Nature and Circumstances of the Offense**

Sackman sold the counterfeit Ozempic products to people she did not know, and whose medical histories were unknown to her. The products that she sold to them originated from an Asian source, not from an FDA-registered supplier.

Even if Sackman had acquired the products from an authorized source, she still could not have legally distributed them to the public because she was not licensed to dispense and sell prescription drugs. She did not ask, and apparently did not care, whether any of the victims had a prescription.

By coincidence, the victims ended up at the same hospital (Northwestern) during the same holiday week, where they each remained for several days. One of the victims required emergency care and an ambulance transport to the hospital. He credited his girlfriend, also a victim, for saving his life by calling 911 and administering CPR. *See Government's Version of the Offense* ("*GVO*"), at 8 & n.9. She too believed that he could have died. *Id.* at 10.

At no time did Sackman attempt to reach out to any of the victims or to the FDA to offer her assistance. She instead sought a refund from the drug supplier and from her credit card company (*id.* at 14-17) and disappeared when the FDA sought to speak to her.

### 2. History and Characteristics of the Defendant

Sackman is 53 years old. *PSR*, at 12 ¶62. She grew up in middle class family in St. Louis. *Id.* at 12 ¶¶62-63. She currently resides in a coastal, resort area in Mexico (Playa del Carmen) with her husband. *Id.* at 13 ¶66.

Sackman's educational background includes an associate's degree in nursing. *Id.* at 15 ¶85. She obtained her nursing license in the State of Illinois in 1998, which she maintained until 2024 (*id.* at 15 ¶86), after committing the offenses in this case.

Sackman now supports herself with inheritance and trust funds. *Id.* at 15 ¶88. Her net worth exceeds $4.4 million, consisting primarily of securities, trust assets, and other unspecified assets in various retirement and inheritance accounts. *Id.* at 16 ¶93. Sackman's reported monthly income from the trust assets is $8,000. *Id.* at 17 ¶93.

### 3. Other Pertinent § 3553 Factors

Among the other sentencing factors pertinent to this case are the need for the sentence to reflect the seriousness of the offenses and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2).

#### ***a. Seriousness of the Offenses***

Sackman's offenses were undeniably serious, having led to the hospitalization of several people. That the victims suffered as a result of products sold to them by a nurse is as ironic as aggravating.

Only Sackman knows if there were additional people to whom she sold bad products, and how she disposed of any unsold products from the same bad batch(es).[1] What is known is that Sackman never contacted the FDA—despite knowing that the FDA wanted to speak to her[2]—to assist the FDA in its investigation, to surrender any remaining products, and to report the source of the dangerous products that were being placed into the stream of domestic and foreign commerce.

***b. Deterrence***

"By including general deterrence as a required consideration, Congress embraced the idea that criminal sentences influence behavior in society. The idea of general deterrence, put simply, is that the longer the sentence, the more it will discourage similar criminal conduct by others." *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023) (citing *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)).

Deterrence is especially important in a case such as this, which involves violations of laws designed to protect the public health and welfare. *See United States v. Watkins*, 278 F.3d 961, 964 (9th Cir. 2002) ("[t]he Food, Drug, and Cosmetic Act is a public welfare statute that imposes 'the highest standard of care on distributors'") (quoting *Smith v. California*, 361 U.S. 147, 152 (1959)). "It was enacted to enable

---

[1] Sackman bought the products from the same overseas supplier on two separate occasions. *See GVO*, at 16 & Exh. 8 at 2. ("…I bought Ozempic from Mary Basquez twice...September 25 [and] October 17 [2023]").

[2] In an email to her supplier, Sackman complained: "…Now the FDA is asking questions…." *Id.*

purchasers to make intelligent choices, and, to that end, '[m]isbranding was one of the chief evils Congress sought to stop.'" *Id.* (quoting *United States v. 45/194 Kg. Drums of Pure Vegetable Oil*, 961 F.2d 808, 812 (9th Cir. 1992)); *see also United States v. Sullivan*, 332 U.S. 689, 696 (1948) ("[the Act's] purpose was to safeguard the consumer by applying the Act to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer").

It is important for the public and the health care community to know that providers who sell prescription drugs without a prescription, and without a proper license, will be prosecuted and punished when placing bad products into the stream of commerce (whether intentionally or recklessly), thereby placing public health and safety at risk.

## III. The Government's Recommendation

### *A. Imprisonment/Community Confinement (1 month)*

For the reasons discussed above, the government respectfully recommends that the Court impose a sentence which includes a 1-month term of custody, to be satisfied either by imprisonment or community confinement, or a combination thereof. Such a sentence, within the advisory Guideline range as calculated by the Probation Officer, would be "sufficient, but not greater than necessary" (18 U.S.C. § 3553(a)) to satisfy the statutory objectives of sentencing.

### *B. Supervised Release (12 months)*

Any custodial term imposed by the Court should be followed by a period of supervised release. Although Sackman resides in Mexico, outside the jurisdiction of this Court, the government recommends that the Court impose a term of supervised release so that Sackman will be subject to the Court's jurisdiction in the event that she returns to the United States during that period of time.

The government recommends that the Court impose the maximum period of supervised release, one year, to provide the maximum opportunity to supervise Sackman's agreement to pay restitution and her compliance with the law.

### *C. Monetary Fine ($50,000)*

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that [s]he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added).

The maximum fine that may be imposed in this case is $100,000. 18 U.S.C. § 3571(b)(5). Based on the Probation Officer's Guideline calculations, the advisory Guideline range is much lower, $500-$9,500. U.S.S.G. § 5E1.2(c)(3). The Guidelines provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* § 5E1.2(d).[3]

[3] For purposes of making that determination, the Guidelines advise the courts to consider a variety of factors, including the § 3553 factors (*see* U.S.S.G. § 5E1.2(d)(1)), the defendant's ability to pay (*id.* § 5E1.2(d)(2)), any restitution that the defendant is obligated to make (*id.* § 5E1.2(d)(4)), and any other collateral consequences of a conviction (*id.* § 5E1.2(d)(5)), among other factors.

If the Court elects not to impose a custodial sentence in this case, and Sackman cannot be supervised as a practical matter because she resides in a foreign country, then it becomes imperative that the Court impose a significant fine to ensure that Sackman's combined sentence "is punitive." *Id.* Restitution, standing alone, does not serve that purpose. If and when paid to the victims, restitution may make them financially whole, but restitution is not, in and of itself, punitive.

Considering Sackman's net worth, which includes millions of dollars in liquid assets, she cannot establish that she is unable to pay a fine. To reflect the seriousness of the offenses and to deter other providers from placing the public health and safety at risk, the government recommends a fine in the amount of $50,000, an amount which Sackman clearly can afford to pay.

***D. Restitution ($83,223)***

The victims incurred financial losses for having spent thousands of dollars to buy fake products which sickened them and which resulted in thousands of dollars more in medical costs. While Sackman may not have a statutory legal obligation to reimburse them for their losses, she has a moral obligation to do so.

To her credit, Sackman realizes that now, though she didn't show the same level of urgency in the aftermath of the victims' hospitalization when she repeatedly called and emailed her own credit card company and her Ozempic supplier seeking reimbursement for herself—without ever reaching out to any of the victims. *See GVO*, at 14-15 (calls to credit card company) & 16-17 (emails to supplier).

In any event, Sackman's agreement to pay restitution now is better late than never, and with her agreement, the Court should order restitution in the total amount of $83,223, payable to the victims and their insurers.

## IV. Conclusion

In sum, the government respectfully recommends that the Court impose a sentence which includes the following terms:

1. a 1-month term of custody, to be satisfied either by imprisonment or community confinement;
2. a 12-month term of supervised release;
3. a fine in the amount of $50,000; and
4. an order of restitution in the amount of $83,223.

Upon the imposition of sentence on Count Three of the information, the government shall move to dismiss the remaining counts (Counts One, Two, and Four).

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/Brian Havey*
BRIAN HAVEY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 469-6305
brian.havey@usdoj.gov