**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 CR 778 |
| v. | ) | |
| | ) | Hon. Laura K. McNally |
| SHARON CHRISTINE SACKMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SHARON SACKMAN'S OBJECTIONS TO THE PSR**
**AND POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS**

Sharon Sackman, by and through her attorneys, Blegen & Associates, respectfully submits the following objections to the Presentence Investigation Report ("PSR") and her position paper and commentary on sentencing factors.

**INTRODUCTION**

On August 12, 2026, Ms. Sackman pleaded guilty to Count Three of the information, which charges her with selling a counterfeit drug in violation of 21 U.S.C. §§ 331(i)(3) and 333(a)(1) — a strict liability misdemeanor offense which does not require a defendant to have knowledge that the drug was counterfeit. She has agreed to pay $83,223 in restitution to the three victims and their insurers, including for relevant conduct that would not ordinarily generate restitution. PSR ¶¶ 4, 32. Those funds will be in counsel's client fund account and available for payment in full at the time of sentencing.

The probation office has resolved the two contested guideline issues in Ms. Sackman's favor. It found that the offense did not involve fraud and that the cross-reference at USSG §2N2.1(c)(1) therefore does not apply, PSR ¶ 44, and it found that no adjustment under USSG §3B1.3 is warranted, PSR ¶ 47. The defense agrees with both determinations.

The defense also accepts the probation office's remaining calculations. Ms. Sackman has no criminal history points, but because the three drug purchasers were hospitalized, the probation office concluded that the offense "resulted in serious bodily injury" and that the adjustment for zero-point offenders under USSG §4C1.1 is therefore unavailable. PSR ¶ 51. Ms. Sackman does not contest that conclusion. The defense would note that that the "serious bodily injury" preclusion in § 4C1.1(a)(4) does not turn on a defendant's intent to cause physical harm. The preclusion depends simply on the *result* of an offense, including whether hospitalization was required as it was here.

The total offense level is 4, the criminal history category is I, and the advisory range is zero to six months — a range in Zone A, in which no term of imprisonment is required. PSR ¶¶ 98-99. The probation office nonetheless recommends one month in custody. That recommendation is above the national norm for this offense: of the 62 defendants sentenced under §2N2.1 at the same offense level and criminal history category over the last five fiscal years, 74% received no imprisonment at all, and the median sentence was zero months. PSR ¶ 116. Ms. Sackman respectfully submits that a non-custodial sentence, together with full restitution, and other conditions the Court can impose, for example community service, is sufficient but not greater than necessary to serve the purposes of sentencing.

## I. OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

### A. Paragraph 61 (page 12) — Collateral interview.

Paragraph 61 states that attempts to conduct a collateral interview with Ms. Sackman's lifelong friend were unsuccessful. The defense has coordinated with the probation officer to arrange for a call.

### B. Paragraph 93 (pages 16-17) — Net Worth.

It appears that the probation department inadvertently over-calculated Ms. Sackman's net worth by double counting an asset. The defense has contacted the probation department about this issue and will provide an update at the time of sentencing.

## II. THE GUIDELINE CALCULATION

### A. The calculation.

The defense agrees with the probation office's calculation:

| | |
|---|---|
| Base offense level, USSG §2N2.1(a): | 6 |
| Cross-reference, USSG §2N2.1(c)(1): | not applicable |
| Adjustment for role, USSG §3B1.3: | not applicable |
| Acceptance of responsibility, USSG §3E1.1(a): | -2 |
| **Total offense level:** | **4** |

With a criminal history category of I, the advisory guideline range is zero to six months. The range is in Zone A, and "a sentence of imprisonment is not required." USSG §5C1.1(b); PSR ¶¶ 98-99. The statutory maximum is one year. 21 U.S.C. § 333(a)(1). The government maintains that the total offense level is 13, based on the fraud cross-reference at USSG §2N2.1(c)(1) and an adjustment under USSG §3B1.3. PSR ¶ 100. The probation office correctly rejected both positions. PSR ¶¶ 44, 47.

### B. The offense of conviction is a strict-liability misdemeanor, and the guilty plea establishes no knowledge.

Count Three charges a violation of 21 U.S.C. §§ 331(i)(3) and 333(a)(1). Section 331(i)(3) prohibits the sale or dispensing of a counterfeit drug; § 333(a)(1) is the penalty provision and makes the offense a misdemeanor. Unlike most criminal charges, the charge here does not require knowledge or any scienter whatsoever. To be guilty, Ms. Sackman did not need to know that the Ozempic she sold was counterfeit, and the government would not have had to prove that she knew.

The offense at issue here, part of the Federal Food, Drug, and Cosmetic Act, is the paradigm public welfare offense. In *United States v. Dotterweich*, 320 U.S. 277 (1943), the Supreme Court explained that such legislation:

> dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. And so it is clear that shipments like those now in issue are "punished by the statute if the article is misbranded (or adulterated), and that the article may be misbranded (or adulterated) without any conscious fraud at all."

*Id*. at 280-81 (internal citations omitted); *see also United States v. H.B. Gregory Co.*, 502 F.2d 700, 705 (7th Cir. 1974).

More recently, the Ninth Circuit has likewise explained that "under well-settled law, the referenced base offense in § 333(a)(1) does not require proof of scienter." *United States v. Marschall*, 82 F.4th 774, 781 (9th Cir. 2023).

There is a felony version of § 333 that *does* require scienter. Section 333(a)(2) elevates the offense to a felony where the violation is committed "with the intent to defraud or mislead."[1] As the Second Circuit put it, § 333(a) "creates a harmonious and rational scheme: unintentional distribution of misbranded products . . . is punished only as a misdemeanor, while aggravated felony penalties are applied where the misbranding is deliberate, knowing, and intended to harm, deceive, or cheat." *United States v. Fishman*, 157 F.4th 143 (2d Cir. 2025). Here, the government charged the misdemeanor. It did not charge the felony, and Ms. Sackman did not plead to a felony or admit to conduct comprising a felony.

Ms. Sackman's plea establishes that she sold a counterfeit drug; it does not establish that she knew the drug was counterfeit, because knowledge is not an element. Her admission in the plea agreement's factual basis that the pens "were counterfeit" is an admission regarding what the

[1]Prior convictions for the same offense can also elevate the felony to a misdemeanor.

government can prove, not about her state of mind. *See*, Dkt. 21, p. 4 ("Defendant acknowledges the government can establish the following . . . [t[he pens were counterfeit because they were not Ozempic, were not manufactured by Novo Nordisk, and did not contain semaglutide.")

### C. The fraud cross-reference at USSG §2N2.1(c)(1) does not apply as a matter of law.

The cross-reference to the fraud guideline applies only "[i]f the offense involved fraud." USSG §2N2.1(c)(1). The government's Version of The Offense (attached to the PSR along with the defense Version) does not argue that Ms. Sackman knew the Ozempic was counterfeit. It argues instead that she knew she was unlicensed, knew she was buying outside the regulated supply chain, and was "thereby running a risk that she could be distributing products that were not authentic and safe." PSR ¶ 42. That describes recklessness at most. Running a risk is not fraud.

#### 1. "Fraud" is undefined in the Guidelines and carries its settled legal meaning.

In drafting the Guidelines, the Sentencing Commission did not define "fraud." The general definitions in Application Note 1 to §1B1.1 supply definitions for many terms, but fraud is not among them, and neither §2N2.1 nor §2B1.1 defines "fraud" in its own commentary. When interpreting the Guidelines, courts begin with the text and the plain meaning of its words. Undefined terms that do not carry a common-law meaning are given their ordinary meaning. *United States v. Johnson*, 784 F.3d 1070, 1073-74 (7th Cir. 2015). The only court of appeals decision the defense has found that supplies a definition of "fraud" for purposes of §2N2.1(c)(1) adopted the dictionary formulation: fraud is "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." *United States v. Kumar*, 112 F.4th 30 (1st Cir. 2024) (quoting *Fraud*, Black's Law Dictionary (11th ed. 2019)). The word "knowing" appears twice. The conduct that satisfied that definition in *Kumar* illustrates the distance between this case and a fraud case: in *Kumar*, the defendant oversaw call centers

whose representatives told customers that they were located in the United States, that they were calling from a pharmacy, that no prescriptions were needed, and that the drugs were FDA-approved. *Id*. at 33, 36. Nothing approaching that sort of conduct is alleged here.

The common-law definition of fraud makes even more clear that the cross-reference does not apply. The Seventh Circuit has recently explained that "[c]ommon-law fraud has three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." The court defined scienter as the "intent to deceive or manipulate." *CFTC v. Donelson*, 115 F.4th 791 (7th Cir. 2024) (citing *Neder*, 527 U.S. at 22-23, and *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023)). Neither knowledge nor intent to deceive or manipulate are alleged here, nor do the facts support such a finding.

**2. The Commission writes "reckless" when it means reckless.**

The government's recklessness argument does not support the cross-reference. If the Sentencing Commission wanted recklessness to suffice, it would have said so. The Commission uses the word "reckless" when it intends to capture reckless conduct. *See* USSG §2B1.1(b)(16)(A) (offense involving "the conscious or reckless risk of death or serious bodily injury"); §2A1.4 & cmt. n.1 (defining "reckless" as awareness of "the risk created by his conduct"); §3C1.2 ("reckless endangerment during flight"). Section 2N2.1(c)(1) uses the term "fraud;" it did not use "reckless." "[T]he precision of the drafters in including mens rea in neighboring sections indicates that the reason that [a guideline] does not use the word . . . is that the drafters did not wish such a requirement to apply." *United States v. Singleton*, 946 F.2d 23, 25 (5th Cir. 1991). The Sentencing commission could have triggered the cross reference based on recklessness; it unequivocally did not.

Section 2N2.1's own commentary notes confirm that recklessness does not suffice. As the very first note makes clear, the guideline "assumes a regulatory offense that involved knowing or reckless conduct," and provides that "[w]here only negligence was involved, a downward departure may be warranted." USSG §2N2.1 cmt. background. Reckless conduct is thus already factored into the base offense level of six. It is the middle ground between negligence, which may call for a departure below six, and fraud, which triggers the cross-reference. On the government's reading, recklessness would trigger the cross-reference. Section 2N2.1 would then be left to govern only negligent offenders — the very defendants the Commission identified as candidates for a downward departure. This would be nonsensical reading of the guidelines and should be rejected. The Commission would not recommend a downward departure for mine-run cases that fall under the guideline.

**D. The facts do not establish fraud.**

The probation office, having reviewed both parties' submissions, found that "it does not appear as though this offense involved fraud" and that "[i]t is not clear by a preponderance of the evidence that the defendant knew what she purchased was counterfeit Ozempic." PSR ¶ 44. That finding is supported by the record, including the exhibits presented in the government's Version of the Offense

**1. The price Ms. Sackman paid signaled foreign-market product, not counterfeit.**

In 2023, genuine Ozempic sold abroad for a fraction of its U.S. price. The September 2024 majority staff report of the Senate Committee on Health, Education, Labor, and Pensions reports monthly Ozempic prices of $969 in the United States, $155 in Canada, $122 in Denmark, $92 in

the United Kingdom, and $59 in Germany. Def. Version, Ex. A, Table 1.[2] A maintenance pen delivers roughly four weekly doses, so the monthly price is the price of one pen. Ms. Sackman paid $150 per pen — $4,500 for thirty pens, plus $281 in shipping. Def. Version, Ex. C (Easemart pro-forma invoice No. SEM01928, Sept. 22, 2023); PSR ¶ 9. That price exceeds the authorized retail price of genuine Ozempic in the United Kingdom, Germany, and Denmark. It is not a price that signals a counterfeit; it is a price that signals foreign-market product with a markup.

### 2. Ms. Sackman sought out Ozempic by name and refused the substitutes she was offered.

The government's own exhibits show suppliers trying to sell Ms. Sackman something other than Ozempic, and Ms. Sackman turning them down. Easemart's representative wrote, "Unfortunately we don't have Ozempic pen for weight loss, however we have Slimming Injection on our website," and later, "I already check our products list I have a good news we have Saxenda 1mg and 2mg ma'am." Ms. Sackman declined: "Hello .. No thank you." Gov't Version Ex. 6. Another merchant offered a "generic of ozempic" at $70 per injection; the full email chain shows that Ms. Sackman never made the purchase and stopped responding once the merchant made clear the product was not Ozempic. Def. Version, Ex. B; Gov't Version Ex. 5. A seller who is passing off fakes, or who does not care whether the product is genuine, takes the cheaper substitute. Ms. Sackman declined it and waited for what she was told was the real thing.

### 3. The supplier represented the product as Ozempic in writing, and the counterfeits were convincing.

The September 22, 2023 invoice describes the goods as "Ozempic pen 1mg," quantity "30.0 Units." Def. Version, Ex. C. No communication in the government's exhibits suggests that

[2] The defense version ad exhibits along with the government version and exhibits are all attached to PSR.

the pens were anything but Ozempic. One of the victims, a lawyer of thirty-four years' experience, told the agents that the boxes "appeared to be the same boxes that [she] had seen advertised on television." Gov't Version, Ex. 3, p. 3. Novo Nordisk's director of risk management — an expert, examining photographs — identified the pens as counterfeit Sanofi Apidra pens bearing Ozempic labels, and the lot number printed on them was a genuine Novo Nordisk lot number. PSR ¶ 23. If the counterfeit could be identified only by the manufacturer's own security personnel, and carried a legitimate lot number, it is no surprise that a reseller did not identify it.

### 4. Ms. Sackman's conduct after the hospitalizations is inconsistent with prior knowledge.

As reported by the friend who had introduced one of the victims to Ms. Sackman, Ms. Sackman was devastated when she learned that people had been hospitalized. Gov't Version, Ex. 3, p. 6. In addition, within about a week of learning what had happened, Ms. Sackman wrote to her supplier: "Somebody got sick, went to the hospital & the product was tested & they said it is repackaged insulin. Now the FDA is asking questions. I want those charges refunded. I have remaining products left & will mail back to you." PSR ¶ 25. When no one answered, she wrote again on January 15, 2024 — "It's been 9 days since I emailed your company regarding your medical products being counterfeit. No response ????" — and again on January 16. Gov't Version at 16-17. She filed a fraud claim with her credit card company under her own name, identified the exact transaction, and told the representative: "because they gave me fraudulent medicine and I emailed them and they will not contact me back and I had them tested and it's fake." PSR ¶ 26. She pressed the claim more than a dozen times and was denied only because it was untimely.

A person who knowingly bought and resold counterfeit Ozempic does not demand a refund from her supplier/co-schemer, offer to ship the remaining inventory back, and press a fraud claim

with her credit card company under her own name. Those are the acts of someone who has just discovered that she was defrauded.

**5. Ms. Sackman understands the seriousness of her conduct.**

Distinguishing Ms. Sackman's conduct from that which would call for the cross-reference is not meant to denigrate the seriousness of the offense. Fraud or no fraud, Ms. Sackman realizes that she had no business selling a prescription drug she was not licensed to sell, and no business buying it from an overseas source. She knows that, and she is sincerely remorseful. But there is a substantial difference between a person who sells a drug she should not have been selling and is deceived about its authenticity, and a person who knowingly passes off insulin or some other drug as Ozempic. Ms. Sackman is the former, and the cross-reference is inapplicable.

**E. No adjustment under USSG §3B1.3 is warranted.**

Section 3B1.3 applies only where a position of trust or a special skill "significantly facilitated the commission or concealment of the offense." Ms. Sackman's nursing license did not. She had no authority to prescribe, and she exercised none. She did not work out of a medical office, hospital, or any other health care facility; the victims found her by word of mouth. PSR ¶ 7. Two of the three victims did not know she had any medical credential at all. Benson MOI at 2; O'Brien MOI at 3. Any person contacting the same overseas supplier could have done exactly what she did — buying pens online and reselling them requires no nursing education, training, or license.

The probation office reached the same conclusion, finding that Ms. Sackman "did not hold a position of trust with respect to any of the victims," that there is "no evidence they based their decision to buy Ozempic from her because of the defendant's status as a nurse," and that her skills as related to this offense were not of the kind requiring "substantial education, training or licensing." PSR ¶ 47 (citing USSG §3B1.3, cmt. n.4). The § 3B1.3 enhancement does not apply.

**F. Acceptance of responsibility.**

Ms. Sackman has accepted responsibility under USSG §3E1.1(a) and timely notified the government of her intention to plead guilty under §3E1.1(b). The probation office agrees. PSR ¶¶ 37, 50. The additional one-level reduction under §3E1.1(b) is available only where the offense level is 16 or greater before the two-level reduction, which is not the case under the correct calculation.

## III. POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS

### A. The Guideline are a starting point; 18 U.S.C. § 3553(a) provides the factors that determine the sentence.

Section 3553(a) provides the factors that courts must consider in imposing a sentence, and adequate consideration of the § 3553(a) sentencing factors ensures that the sentencing decision is individualized, as it must be. The Supreme Court made this point clear when it emphasized that the punishment imposed "should fit the offender and not merely the crime." *Pepper*, 562 U.S. at 487-88 (citations omitted). *See Gall*, 552 U.S. at 52, (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); *see United States v. Moore*, 784 F.3d 398, 405 (7th Cir. 2015) (quoting *Gall*, 552 U.S. at 49-50) ("The court must consider all of the section 3553(a) factors, making 'an individualized assessment based on the facts presented.'"). *See also Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) ("Indeed, it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

The "sufficient, but not greater than necessary" standard—also known as the "parsimony" clause—is the "overarching provision" of § 3553(a). *Kimbrough*, 552 U.S. at 101. By its terms, that provision instructs the Court to consider a sentence that is the *least* severe, *i.e.*, not greater

than necessary. *See United States v. Santoya*, 493 F.Supp.2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant."). Thus, while the Court's first step is to calculate the guideline range, the case must be determined based on consideration of the § 3553(a) factors to arrive at a just and merciful sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a); *see also United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (internal citations omitted) ("the Guidelines are, after all, guidelines [that] must be considered seriously and applied carefully…. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a).").

**B. The nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1).**

Ms. Sackman pleaded guilty to a strict-liability public welfare misdemeanor, and the probation office correctly found that the offense did not involve fraud. PSR ¶ 44. She sought out Ozempic by name, refused the substitutes she was offered, paid a price above the authorized retail price of genuine Ozempic in three foreign countries, and received an invoice describing the goods as "Ozempic pen 1mg." The pens she resold bore a genuine Novo Nordisk lot number and packaging that the manufacturer's own risk-management director needed photographs to identify as inauthentic. PSR ¶¶ 9, 23, 28.

None of that excuses what she did, and Ms. Sackman fully accepts responsibility for her offense. She was not licensed to sell or dispense prescription drugs, and she had no business buying them from an overseas source. Three people were hospitalized, and she understands the responsibility she bears for that decision. PSR ¶¶ 27, 30. Ms. Sackman has agreed to pay full

restitution of $83,223 — including for relevant conduct that would not ordinarily generate a restitution obligation — to the victims and their insurers. PSR ¶¶ 4, 32-33. The funds for restitution will be in counsel's client fund account and available for restitution at the time of sentencing.

### C. The history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).

#### 1. Family and background.

Ms. Sackman is 53 years old. She was born in St. Louis and raised in a middle-class household by two parents who were active in her life; her parents divorced when she was in second grade, and she describes the six years that followed as stressful. PSR ¶¶ 62-63. Her sister Stephanie was killed in a car accident at 17. PSR ¶ 62. Her maternal grandfather, a police officer who came home from war with untreated psychiatric illness and drank, in Ms. Sackman's words, "to not have memories," took his own life on January 8, 2024. PSR ¶ 64. Ms. Sackman remains close to her parents and her surviving sister and speaks with them weekly. PSR ¶ 62.

#### 2. Years of lawful work.

Ms. Sackman earned an associate's degree in nursing from St. Louis Community College in December 1994 and passed the national licensure examination in February 1995. PSR ¶¶ 85-86. She worked as a registered nurse in long-term-care facilities in Missouri and Texas and later at spas, from 1995 until she retired in 2019. PSR ¶¶ 88, 91. Until this case, she had never been arrested or charged with anything. PSR ¶¶ 54-57.

#### 3. Loss, and the period in which this offense occurred.

Ms. Sackman married Stephen Battreall on September 1, 2022. He died suddenly of a heart attack in March 2023, less than seven months later. PSR ¶ 65. The conduct in this case followed in the months after his death: the purchase the government links to the victims' illnesses was made in September 2023. PSR ¶ 9. Two weeks after she learned the victims had been hospitalized, her

grandfather killed himself. PSR ¶¶ 25, 64. Ms. Sackman struggled with her husband and her grandfather's deaths as well remorse regarding the victims' hospitalizations. She began therapy after her husband's death and continues in treatment today. PSR ¶ 77.

This context does not excuse Ms. Sackman's offense, but it provides the Court some insight into the turmoil in Ms. Sackman's life surrounding the time of her offense as § 3553(a) requires.

### 4. Health.

Ms. Sackman's has eye ptosis and required a skin graft above her left eye; because of scar tissue, neither eye fully closes. She sleeps in a mask, uses prescribed Thealoz eyedrops and Aquadran gel — both verified by prescription records — and has ongoing appointments with an ocular plastic surgeon to determine treatment. She is treated by a psychologist and a psychiatrist in Playa del Carmen and is prescribed lorazepam, also verified by prescription record, for anxiety and insomnia. PSR ¶ 77. Ms. Sackman has had a recent medical appointment related to her eye issue. The defense will provide an update if necessary in advance of sentencing.

### 5. Letters from Ms. Sackman's husband and her closest friend.

Two letters are submitted in support of Ms. Sackman, and copies will be hand-delivered to the Court. The first is from her husband, Salvatore Ferrara, who wrote in Italian and had the letter professionally translated. Mr. Ferrara met Ms. Sackman in Positano in June 2025, moved to Mexico when his work contract ended that November, and married her on March 10, 2026. Over the past year he has watched her "face the consequences of that decision and the strain of this whole affair," and he has "seen how deeply she regrets what she did." Ash he explains, she "has taken responsibility for her actions," and he commits to standing by her and "ensuring she never makes such a decision again."

The second letter is from Betty Kakaletris, who has known Ms. Sackman for 28 years and first met her when she hired her on her twenty-fifth birthday. Ms. Kakaletris writes that over those years the two have “worked together, lived together, traveled together, celebrated some of life’s happiest moments, and supported one another through some of its most painful ones” — she stood beside Ms. Sackman when Mr. Battreall died, as Ms. Sackman had stood beside her when her own husband died. She describes Ms. Sackman’s instinct “to step in, take responsibility, and do whatever she can to support the people around her,” acknowledges that this willingness to help has “sometimes led her to take on more than she should,” and states that she is “confident that Sharon has learned the importance of establishing better boundaries when helping others.” She closes: “without Sharon, I would not be here today.” Ms. Kakaletris is the lifelong friend the probation office was unable to reach for a collateral interview. See PSR ¶ 61; Objection A above.

**C. A non-custodial sentence satisfies the purposes of sentencing. 18 U.S.C. § 3553(a)(2).**

**1. Seriousness, respect for law, and just punishment.**

Congress made this offense a misdemeanor and capped it at one year because it is punished without regard to knowledge. Ms. Sackman is being sentenced for selling a product she should never have been selling — not defrauding anyone or knowingly injuring them. The punishment she already faces is not trivial: a federal conviction, an $83,223 restitution obligation. The probation office itself observed that she “appears remorseful for her conduct and the impact of the offense on the victims.” Recommendation at 2.

**2. Deterrence and protection of the public.**

The probation office found that “specific deterrence is not a significant factor of consideration” and that Ms. Sackman “does not appear to pose a threat to community safety.” Recommendation at 3. She is 53, has no criminal history, and can never again practice as a nurse. She also has zero

criminal history points — a group the Commission's own research identifies as substantially less likely to reoffend, and one whose recidivism rates decline further with age. *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017).

As to general deterrence, the message of this case — a federal conviction, along with full restitution— does not depend on thirty days in custody. General deterrence works through the public message a prosecution sends, and that message has already been delivered in this case. The United States Attorney's Office announced the charges in a press release on January 14, 2026, and the case was reported that day by the Chicago Sun-Times, NBC Chicago, CBS Chicago, and Fox 32 Chicago, among other outlets, as well as in the nursing trade press. A search of Ms. Sackman's name returns those reports along with others on Facebook, YouTube, and Instagram. There will undoubtedly be more coverage after sentencing. Anyone inclined to buy prescription drugs from an overseas supplier and resell them has already been told publicly, or soon will be, what that choice can cost: a federal prosecution, a criminal conviction, and an order to repay more than $83,000 - an amount far exceeding the gain from the offense. That message will be adequately delivered, and a term of imprisonment would not significantly amplify it.[3]

**D. The need to avoid unwarranted disparities. 18 U.S.C. § 3553(a)(6).**

Among the 62 defendants sentenced nationally over the last five fiscal years whose primary guideline was §2N2.1, with a final offense level of 4 and criminal history category I, excluding §5K1.1 cooperation departures, only 16 — 26% — received a sentence of imprisonment in whole or in part. Approximately 74% received no jail time. Across all 62 defendants, the median sentence was zero months. PSR ¶ 116.

[3] An important message about avoiding the use of drugs obtained without a prescription and outside of the normal supply chain will also be delivered.

A non-custodial sentence is thus the ordinary outcome for this offense and this offender, not a departure from it. The probation office's recommendation of one month tracks the national average, which is pulled upward by the quarter of defendants who received custody; the median — the sentence most defendants in this group actually receive — is zero.

**E. The kinds of sentences available. 18 U.S.C. § 3553(a)(3).**

Because the range is in Zone A, the Court may impose a sentence of probation, or a sentence of a fine alone, without any term of imprisonment. USSG §5C1.1(b); 18 U.S.C. § 3561. A fine-only sentence is an authorized disposition for a Class A misdemeanor in Zone A, and the guidelines do not require any term of imprisonment here.

Ms. Sackman resides in Playa del Carmen, Mexico, with her husband. PSR ¶¶ 66, 68. The probation office did not recommend a term of supervised release, concluding that an individualized assessment does not warrant supervision and that she "does not appear to need support for reintegration into the community." Recommendation at 4.

Mr. Ferrara's letter also bears on the practical consequences of a custodial sentence. He writes that he does "not have permission to live or work in the United States, and obtaining it would take a very long time." Their "home and ... life together are in Mexico," and they "have never planned to live in the United States." A sentence requiring Ms. Sackman "to remain there," he writes, "would separate us for a long period."

**F. Restitution**

Ms. Sackman has agreed to pay restitution of $83,223 and does not contest the amount. PSR ¶ 32. The full amount will be available at the time of sentencing.

## CONCLUSION

For the foregoing reasons, Ms. Sackman respectfully requests that the Court impose a non-custodial sentence, together with restitution in the amount of $83,223. Should the Court conclude that more is required, that conclusion can be given effect without imprisonment. Ms. Sackman is prepared to perform community service, to pay a fine, or to accept any combination of those conditions that the Court believes is necessary to serve the purposes of sentencing.

Respectfully submitted,

s/Patrick W. Blegen
**PATRICK W. BLEGEN**, one of the attorneys for Sharon Sackman.

**BLEGEN & ASSOCIATES**
53 West Jackson Boulevard
Suite 1424
Chicago, Illinois 60604
(312) 957-0100